# United States District Court for the District Of Maryland
## [Northern Division]

---

**ESTATE OF WILLIAM MADDEN**
(No. 6721-0452 - Orphans' Court
York County, Pennsylvania)

*(By Carol Madden Personal Rep. and
Successor-in- Interest to  Decedent
in the Survival Action),*

**&**

**CAROL MADDEN,**
931 Stonehaven Way
York, Pennsylvania 17403
    *Plaintiffs.*

**v.**

**SOUTHWEST AIRLINES CO.**
P.O. Box 36611
2702 Love Field Drive
Dallas, TX 75235
    *Defendant.*

---

**Case No. 1:21-cv-672**
[JURY TRIAL DEMANDED]

DAN R. MASTROMARCO
Bar ID: 18243
Attorneys for Plaintiffs
THE MASTROMARCO FIRM, LLP
703 Giddings Avenue, Suite U6
Annapolis, MD 21401
T: 410.349.1725
F:  410.268.1597
Email:  danmastromarco@gmail.com

## COMPLAINT

**NOW COME** the above-entitled Plaintiffs, in their representative and individual capacities, in order to bring this action against Defendant Southwest Airlines Company (hereafter "Southwest").  Plaintiffs allege as follows:

## I.  THE PARTIES

1.     Plaintiff Carol Madden (hereafter "Ms. Madden") resides in York, Pa.

2.     Ms. Carol Madden is the widow of William Madden (hereafter "Mr. Madden" or "Decedent"), whom she married on March 23, 1985.

3.     Until Mr. Madden's wrongful death as alleged herein, Mr. and Ms. Madden (hereafter collectively "the Maddens") shared a household and life together for more than 35 years.

4.     Mr. Madden passed away on August 12, 2020 at the age of 73 from COVID-19  and the complications thereof, having contracted that illness from Ms. Madden.

5.     Defendant Southwest is one of the largest domestic flight operators in the United States.

6.     Southwest operates a major hub base out of the Baltimore/Washington International Thurgood Marshall Airport (hereafter "BWI" or the "BWI base") at whish Southwest engaged in a full range of business activities.

7.     Southwest is headquartered in Dallas, Texas.

8.      At all times relevant to this action, Southwest employed Ms. Madden as a flight attendant who regularly, often weekly, commuted to and from Southwest's BWI base from her residence in Pennsylvania.

9.      Ms. Madden is now the Personal Representative and Successor in Interest to the Estate of William Madden (hereafter "Estate").

10.     The Estate has been open and is pending in the Orphans' Court of York County, PA. since February 25, 2021, to *inter alia* manage the claims embodied in this lawsuit.

11.     By seal of February 25, 2021, the  Register for the Probate of Wills and granted the Letters of Administration certifying Ms. Madden as the Administrator with full authority to act on behalf of the Estate.

12.     The Estate matter is designated as Estate No. 6721-0452.

13.     Together Mr. and Ms. Madden left no issue, and Mr. Madden's mother and father predeceased him.

## II.  JURISDICTION AND VENUE

14.      Subject matter jurisdiction of this Court is predicated on U.S. CONST. ART. III, §2 as codified 28 U.S.C. §1332U.S.C..

15.      Section 1332 provides for "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, … between citizens of different States."

16.    Complete diversity exists among the parties to this suit: Southwest is a Texas Corporation, Ms. Madden is a resident of Pennsylvania and the Estate is formed under the jurisdiction of Pennsylvania.

17.    The wrongful death action is authorized at the state level by Courts and Judicial Proceedings (hereafter "CJP") Title 3 (Courts of General Jurisdiction—Jurisdiction/Special Causes of Action), Subtitle 9 (Wrongful Death), and in particular, §§3–902 and 3–904 thereof.

18.    Jurisdiction over the subject matter of the survival action is predicated at the state level on CJP §6-401 (concerning survival of actions) and Title 7 (Administration of the Estate) (hereafter "Est. & Trusts"), Subtitle 4 (Powers of Personal Representative), and §7-401 (General Powers) (particularly §7-401(y) thereof).

19.    Personal Jurisdiction in Maryland is predicated upon Federal Rule of Civil Procedure (hereafter "FRCP") 4(k) and Maryland Code, Courts and Judicial Proceedings §6-103, which provide respectively, that service of a summons establishes personal jurisdiction over a defendant when there is jurisdiction in Maryland, and that jurisdiction within the State exists when corporations transacts any business or perform any character of work or service in the State, contracts to supply services, or cause tortious injury in the State.

20.    Southwest regularly transacts business in Maryland, regularly supplies services to Maryland residents, and through these contacts (and by conducting required staff training at its BWI base), caused tortious injury within the State of Maryland.

21.    Southwest has continuous and systematic general business contacts within the State of Maryland.

22.    Each of the causes of action set forth in this complaint arise of and relate to Southwest's extensive contacts with Maryland.

23.    Venue is proper in the Judiciary District of Maryland under 28 U.S.C. §1391 because all the events or omissions giving rise to the claim occurred in Maryland.

## III.  ALLEGATIONS COMMON TO ALL COUNTS

***The Training Session Required by Southwest.—***

24.    As required by the 'Vision 100 - Century of Aviation Reauthorization Act of 2003,' as codified in 49 U.S.C. §§44728, Southwest is required by law to demonstrate that each flight attendant aboard an aircraft holds a 'Certificate of Demonstrated Proficiency' issued by the Federal Aviation Administration (hereafter "FAA").

25.    The FAA promulgated specific regulations implementing this legislation under Subpart N, Part 121, Subchapter G, Chapter 1 of Title 14.

26.    At all times material hereto, Ms. Madden possessed the required Certificate of Demonstrated Proficiency.

27.    However, recurrent training and requalification under the FAA Rules was required to maintain that Certificate in good standing.

28.    Because Ms. Madden was a flight attendant and an individual who works in the cabin of an aircraft with 20 or more seats, Southwest, was required to, and did in fact direct her to attend 'Recurrent Training' that would lead to renewal or reauthorization of her 'Certificate of Demonstrated Proficiency.'

29.    Each day, from Monday July 13th through Friday July 17th 2020 Southwest conducted daily Recurrent Training sessions for flight attendants at its BWI base (hereafter, these flight attendants are referred to as "Flight Attendant Trainees" or its singular counterpart, "Trainee")..

30.    At those Recurrent Training sessions, each Flight Attendant Trainee was required to take one day of training, of roughly 8.5 hours in duration, consisting of two distinct sessions with lunch provided between sessions.

31.    Ms. Madden took part in the Recurrent Training Session which took place on July 13, 2020.

32.    When Ms. Madden mustered for her Recurrent Training, Southwest divided the group in which she was a part into two cadres of approximately 10 individuals each.

33.    The Recurrent Training sessions for each group consisted of morning and afternoon modules.

34.    During the morning session, Ms. Madden's ten-person cadre was assigned to perform various "proficiencies."

35.    To demonstrate these "proficiencies" each Flight Attendant Trainee was required to satisfactorily perform certain "hands on" practical tasks that a flight attendant may be required to perform during a flight, particularly  in the case of an in-flight emergency.

***Southwest Failed to Employ Safe Practices with its Trainee-Employees.—***

36.    Throughout the entire training session, Southwest utterly failed to implement the most basic precautions to safeguard the health and wellbeing of the Flight Attendant Trainees from inception of the training though contact tracing.

37.    Neither at the outset of the training nor at any time during the training, did Southwest screen any Flight Attendant Trainees in Ms. Madden's group for symptoms of COVID-19.

38.    At no time did Southwest take the Flight Attendant Trainee's  temperature, nor bother to take the instructor's temperature to determine if the instructor was running a fever.

39.    At no time did Southwest inquire of its instructors or Flight Attendant Trainees any of the basic health screening questions commonly asked..

40.     Southwest did not, as Maryland advises, determine if individuals "who ha[d] traveled recently … to a state with a COVID-19 test positivity rate above ten percent or a case rate over 20 per 100,000" were tested recently (https://covidlink.maryland.gov/content/faqs/#faq3).

41.     During this session, the designated trainers did require Ms. Madden and other Flight Attendant Trainees to wear masks; however, while adhering to this basic practice, Southwest failed to provide any guidance to Ms. Madden or other Flight Attendant Trainees as to the type of mask they should wear.

42.     During this session, no Southwest employee or agent inspected or evaluated the masks worn by its Flight Attendant Trainees, nor provide instructions to the Flight Attendant Trainees on how they ought be worn.

43.     During this session, Southwest neither distributed gloves to the Flight Attendant Trainees, nor provided any guidance to them on the need for gloves.

44.      During this session, Southwest did not educate the Flight Attendant Trainees on the desirability of refraining from touching of the face, eyes or mouth.

45.     During this session, Southwest did neither required the Flight Attendant Trainees nor the instructors to wear gloves, and none did.

46.     During this session, Southwest failed to provide hand sanitizer for Flight Attendant Trainees, and yet as an integral part of the training, Southwest required the Flight Attendant Trainees to become intimately familiar with various devices

necessary for the conduct of their jobs, handling these devices on a sequential and individual basis.

47.    During the training sessions, Southwest failed to demarcate any zones of social distancing, but instead stood passively by while the Flight Attendant Trainees congregated within a couple feet of each other in order to demonstrate their proficiencies.

48.    And although after each employee handled multiple devices required to demonstrate proficiencies, Southwest provided no subsequent wipe-down or sanitation of the devices.

49.    By way of example, while Southwest required each Flight Attendant Trainee Flight Attendant Trainee to stand in lines preparatory to demonstrating their proficiencies, Southwest neither required nor encouraged social distancing while the Flight Attendant Trainees queued up in those lines.

50.    More specifically, during the Recurrent Training, Ms. Madden and other Flight Attendant Trainees were required to demonstrate the use of two different fire extinguisher types(one being 'Halon' and the other, 'CO2'), and as part of this exercise, each Flight Attendant Trinee was to demonstrate in turn how to remove each extinguisher from its holder, how to activate and deactivate it, and how to return each extinguisher to its holder.

51.    Each Flight Attendant Trinee did demonstrate in turn how to remove each extinguisher from its holder, how to activate and deactivate it, and how to return each extinguisher to its holder, including Ms. Madden.

52.    But Southwest failed to sanitize the fire extinguishers before or after their handling by each Flight Attendant Trainee.

53.    Southwest required each Flight Attendant Trainee Flight Attendant Trainee to demonstrate proficiency with two different megaphones, which involved removing the megaphone from its holder, "scratching" for audible sound, and replacing the megaphone in its holder.

54.    Again, although the megaphone as a required device was handled by every Trainee, Southwest made no effort to wipe down or otherwise sanitize any part of any megaphone after use.

55.    Southwest required each Flight Attendant Trainee to remove a protective head covering (*i.e.*, a filter system intended to prevent wearers from breathing in unwanted smoke gases and particulates), known as a "smoke hood" from its case, open the hood, place it over the head of a dummy and return it to its case; however, Southwest neither sanitized the smoke hood, the dummy nor the case between each use.

56.     Southwest required Flight Attendant Trainees to remove, deploy, and inflate a pilot's oxygen mask and then to replace pilot's oxygen mask; however, they failed to sanitize the masks or their containers between each demonstration.

57.     For several proficiencies, Southwest required Flight Attendant Trainees to shout loudly, which contributed to the transmission of the Coronavirus;  however, Southwest did not require or enforce distancing precautions during those activities.

58.     Southwest required Flight Attendant Trainees to display and utilize laminated information placards; however, Southwest failed to sanitize the placards between each demonstration.

59.     Southwest required Flight Attendant Trainees to open airplane doors, but between each use Southwest failed to sanitize the door handles, nor the pulls for the slide, nor the gust locks nor any of the surfaces touched by the Flight Attendant Trainees.

60.     Southwest required Flight Attendant Trainees to sit in mocked-up airplane seats, and at various times in chairs, however, during this procedure, the Flight Attendant Trainees were again required to be in close quarters with no regard for social distancing.

61.     And Southwest failed to sanitize the seats or chairs at any time during the Recurrent Training much less after each individual use.

62.     Southwest required Flight Attendant Trainees to practice self-defense training using a human-sized dummy which the industry affectionately terms "Bob."

63.     The self-defense training with "Bob" required strenuous physical exertion, which involved shouting, and extensive physical contact with the dummy.

64.     But despite the fact that this self-defense training in turn led to heavy breathing and contact with shared surfaces, Southwest failed to sanitize Bob or any of the other equipment used during  this proficiency training.

65.     Southwest required demonstration of additional proficiencies involving use of a life raft and planned and unplanned emergencies.

66.     But although demonstration of these proficiencies demanded use of equipment and close contact between Flight Attendant Trainees, Southwest again failed to implement any social distancing requirements or sanitize any of the equipment used.

67.     In particular, Southwest failed to sanitize the oxygen masks, the Automated External  Defibrillator device, the exit door handle or any of surfaces thereon that came in common contact.

68.     Southwest also failed to sanitize the seats or the laminated emergency checklist or megaphones that were handled by each Flight Attendant Trainee, or the extinguishers, smoke hoods or their cases.

69.     After the first group of approximately ten Flight Attendant Trainees finished their Recurrent Training, the Flight Attendant Trainees were provided lunch, but once again sound health and safety protocols were not practiced.

70.     When lunch was provided for each Flight Attendant Trainee, it was provided in a plastic bag identified by the individual's name.

71.     However, approximately 20 lunches were placed on a table in close proximity, and the Flight Attendant Trainees were required to gather around, with no social distancing mandate, to rummage through the pile in order to find their lunch.

72.     In this chaotic process, many of the lunch bags were handled by multiple Flight Attendant Trainees who rummaged through them to find their designated lunch.

73.     After lunch, the Flight Attendant Trainees sat in a classroom for approximately three hours.

74.     And during this part of training, Southwest again continued its failure to adhere to appropriate safety protocols.

75.     Southwest conducted the mandatory training sessions in a classroom that did not allow for six feet of social distancing.

76.     Indeed, Southwest provide a forum where the tables were only six feet in *total* length, making it so that with 2 Flight Attendant Trainees, sitting on the lengthwise side, had less than 4 feet between them.

***Southwest Knew of Should Have Known of the Need to Safeguard its Employee-Flight Attendant Trainees Against Transmission of SARS-CoV-2.—***

77.     Southwest owed a duty to its Flight Attendant Trainees to exercise reasonable care in implementing safety protocols.

78.     Southwest, however, failed to implement requisite safety protocols, as a result of carelessness, poor planning and a purposeful choice to take shortcuts and save resources.

79.     In doing so, Southwest knew or should have known it was not adhering to a requisite standard of care necessary to safeguard the wellbeing of its employees.

80.     The standard of care Southwest exhibited with its employees stands in stark contrast to the safety precautions Southwest advertises to its customers keep passengers safe on airline flights.

81.     By way of example, in its marketing of the "Southwest Promise," designed to assuage passenger concerns over the safety of flight during the pandemic, Southwest maintains that Southwest "from check-in to deplaning" has the passengers "well-being in mind … employ[ing] stringent cleaning and physical-distancing practices such as using electrostatic and anti-microbial spray treatments in the cabin, implement[ing] physical-distancing measures, modified boarding procedures, and [requiring] masks for Employees."

82.     Among other things, for the public at least, Southwest touts the virtues of its standard of care, boasting *inter alia*,  that "[b]oth an electrostatic disinfectant and an

anti-microbial spray are applied on every surface of the aircraft, killing viruses on contact and forming an anti-microbial coating or shield for 30 days," that "Sani-Cide EX3, a broad-spectrum disinfectant, [is] used to clean onboard lavatories and tray tables before every flight," that "each plane from nose to tail [is cleaned for] nearly 6-7 hours every night," and that "every aircraft is equipped with a sophisticated air distribution system that introduces fresh, outdoor air and HEPA filtered air into the cabin every second while inflight, resulting in exchange of cabin air every two to three minutes [which] removes 99.97% of airborne particles."

83.    Southwest also vaunts that "Hand sanitizer is available at the check-in kiosks, ticket counters, and gates," "wipes [are] available for Customers onboard," that it "help[s] everyone keep their distance" by "posting airport signage and floor markers to encourage physical-distancing in gate areas," that it installed "Plexiglas® … at ticketing and gate counters, and baggage service offices."

84.    Southwest further posits that it "wipes down seats and seatbelts after each seat used by a passenger after each use,"  "sanitizes all 'call buttons,' lights and air conditioning valves above each passenger seat at the end of a flight," and aggressively sanitize[s] the cabin and all equipment and surfaces in a plane after each flight..

85.    And Southwest states that its already sound precautions are constantly being reevaluated "based on public health guidance, scientific research, and advice from

medical and aviation organizations, such as ... Harvard's T.H. Chan School of Public Health, The International Air Transport Association (IATA), ... the U.S. Department of Defense's U.S. Transportation Command, [and their] own medical professionals and infectious disease experts that we've retained to advise us during the pandemic."

86.     In fact, in their "Southwest Promise," Southwest tellingly claims to "know what needs to be done and how it needs to be done to keep people safe."

87.     Accordingly, Southwest was or should have been familiar with the "Guidance on Preparing Workplaces for COVID-19" from the U.S. Department of Labor, Occupational Safety and Health Administration and other publications, which Southwest applied to its customers but not to its Flight Attendant Trainees.

88.     The OSHA publication for example, in its "Steps All Employers Can Take to Reduce Workers' Risk of Exposure to SARS-CoV-2," gave Southwest the tools that it needed to keep its Flight Attendant Trainees safe.

89.     OSHA stated employers should be cognizant of "what sources of SARS-CoV-2 might workers be exposed [to], including ... coworkers... (*e.g.,* international travelers who have visited locations with widespread sustained (ongoing) COVID-19 transmission," emphasize "[t]he need for social distancing ... and other exposure-reducing measures," [and] implement "basic infection prevention measures" such as the "provi[sion] [of] alcohol-based hand rubs containing at least 60% alcohol."'

90.     The OSHA publication encouraged employers to "encourage workers to stay home if they are sick," and "discourage workers from using other workers' … tools and equipment."

91.     Further, the OSHA publication bade employers to "[m]aintain regular housekeeping practices, including routine cleaning and disinfecting of surfaces, equipment, and other elements of the work environment" with "(EPA)-approved disinfectant labels with claims against emerging viral pathogens," to develop "policies and procedures for prompt identification" of the sick, to "develop policies and procedures for employees to report when they are sick.

92.     Because it touted the filtration system that existed on planes, Southwest was aware of OSHA's recommendation to "[i]nstall[] high-efficiency air filters," to "increase] ventilation rates in the work environment," to "minimize contact among workers … by replacing face-to-face meetings with virtual communications," to "[t]rain[] workers who need to use protecti[ve] clothing and equipment how to put it on, use/wear it," and to "[p]rovid[e] … tissues, no-touch trash cans, hand soap, alcohol-based hand rubs containing at least 60 percent alcohol, disinfectants, and disposable towels for workers to clean their work surfaces."

93.     Southwest should have been on heightened alert with its employees, knowing that they traveled for a living and would have been exposed to passengers from every community, city, state and country without having to inquire.

94.     Yet, again, the actions taken in the training session for Southwest employees stand in stark contrast to those steps Southwest knew it needed to protect passengers.

95.     Unlike the litany of precautions Southwest claims it provides to revenue-generating passengers, Southwest failed to sanitize any equipment during required flight attendant training, to exercise or enforce safe distancing protocols, or take any of these reasonable steps to prevent the spread of COVID-19 during Carol Madden's training session as set forth in the OSHA Guidance or which common sense would have dictated.

96.     And Southwest has since recognized its failures: in subsequent training sessions Southwest has implemented numerous changes that recognize the risks and dangers associated with the transmission of SARS-CoV-2 and its variants, correcting its recognized errors.

97.     Had Southwest properly sanitized the equipment it required the Flight Attendant Trainees to share, properly sanitize the tables, and implemented the basic social distancing requirements Ms. Madden would not have been exposed to the SARS-CoV-2 virus that precipitated the death of her husband.  Had Southwest asked the most basic questions of the Flight Attendant Trainees (e.g., have you been exposed to anyone recently with COVI-19), they would have excluded employees who attend the training session while carrying and transmitting the virus.

***Events that Followed the Training.***—

98.     During this training event, Ms. Madden was exposed to SARS-CoV-2, and on information and belief, so were others.

99.     Ms. Madden's exposure to SARS-CoV-2 was primarily caused by the failure of Southwest to exercise a basic standard of care that would have prevented the transmission of the virus.

100.    After the training was concluded, in the late afternoon of July 13, 2020, Mr. Madden picked up his wife, and they drove from BWI to York, Pennsylvania.

101.    On the evening of July 16, 2020, Ms. Madden first began to experience some of the initial symptoms of COVID-19 -- a headache and a feeling of discomfort in her left ear.

102.    On the morning of July 17, 2020, Ms. Madden awoke feeling worse, but believing she might have a sinus infection, a frequent affliction for Flight Attendant Trainees, she contacted her primary care physician who then prescribed antibiotics based on his initial hunch of a sinus infection.

103.    Ms. Madden began taking the antibiotics on July 18th, 2020; but unfortunately, her symptoms did not respond to the antibiotics.

104.    Ms. Madden's health continued to deteriorate.

105.    And on the afternoon of Wednesday July 22, 2020 (Day 9),, Ms. Madden experienced body aches, chills and an intense headache, which temporarily responded to Tylenol.

106.   She exhibited a temperature of 101.4 when her normal temperature is 97.6.

107.   In the early afternoon of July 23rd, 2020 (Day 10), Mr. Madden was beginning to experience worsening symptoms.

108.   On that date, Ms. Madden contacted York WellSpan (the York county health department) and spoke with a nurse, who advised her and her husband to be tested for COVID-19.

109.   On the afternoon of July 23, 2020, Mr. and Ms. Madden went to the South Queen Street Clinic in York, Pennsylvania for a COVID-19 test.

110.   Both Mr. and Ms. Madden were told by staff at the Clinic that they would need to quarantine and remain home until test results became available.

111.   Because of his increasingly deteriorating condition, on July 23rd, 2020, Mr. Madden initiated a telemedicine visit with his physician.

112.   Mr. Madden's physician advised that Mr. Madden to continue to quarantine and to contact him as soon as he received the result of his COVID-19 test taken of July 23, 2020.

113.   One day later, July 24th, 2020 (Day 11), but before her test results came back, Ms. Madden learned disturbing information.

114.   On July 24th, 2020, Ms. Madden reviewed a Facebook page frequented by Southwest Flight Attendant Trainees.

115.   While on that page, through that means and for (and for the first time), Ms. Madden discovered that another flight attendant – one with whom she shared a table during the required BWI Recurrent Training session on July 13th, 2020 – had tested positive for COVID-19 on July 17th, 2020.

116.   The Facebook post also indicated that this particular Southwest Flight Attendant Trainee had had had first started to develop symptoms on July 16th, 2020 – three days after the training session – and on the same date Ms. Madden first started to develop the symptoms.

117.   On this same Facebook page, the afflicted flight attendant indicated that she become very ill by  July 17th, 2020.

118.

119.   .Disturbingly, the Facebook post also indicated that the afflicted Flight Attendant Trainee had been in contact with another COVID-19-positive individual, her daughter.

120.   On information and belief, the Flight Attendant Trainee who had contracted COVID-19 advised Southwest shortly after her test that she had tested positive for COVID-19.

121.   However, upon being advised of the positive test, Southwest failed to publicize it, to perform contact tracing, to alert  potentially affected employees or to

contact the necessary government officials  so as to contain the spread of the transmission.

122.   Significantly, Southwest never even alerted Ms. Madden that she had been in contact with an individual who was suffering from COVID-19.

123.   And again, Southwest failed to screen employees who had been in contact with COVI-19 positive individuals *prior* to the Recurrent Training session.

124.   Had Southwest done so, and learned that the afflicted employee had had exposure to COVID-19, they would have been able to prevent transmission by excluding COVID-19 exposed Flight Attendant Trainees from engaging in the proficiency training until after the requisite quarantine period.

125.   On information and belief, the afflicted employee was not the only carrier of the virus at the Recurrent Training session.

126.   One of the instructors who started teaching the BWI training courses was unable to complete his or her teaching responsibilities through the end of the week because of an unknown illness, which on information and belief was COVID-19.

***Additional Breaches of the Standard  of Care.—***

127.   Southwest not only failed prudently to screen instructors or Flight Attendant Trainees, to enforce social distancing, to enforce mark or glove requirements, or to sanitize equipment being used – breaches that led to the transmission of the virus to

Ms. Madden -- they also failed to exercise due diligence after discovering their Flight Attendant Trainee had tested positive.

128.   Southwest knew or should have known that individuals attending the training had been exposed to a COVID-19-positive individual, but did not, in turn, inform employees in order that they may take reasonable precautions.

129.   Again had Southwest asked prospective Flight Attendant Trainees about exposure to COVID-19-postive individuals, they could have excluded them from the Recurrent Training sessions.

130.    Had Ms. Madden been notified that Flight Attendant Trainees at the session had been exposed to COVD-19, she could have opted out to the Recurrent Training session, and avoid exposure.

131.   And had she timely been advised of her potential exposure to a COVID-19-positive  individual, she would have been able to isolate from her husband.

132.   But even after having been informed that one of its Flight Attendants Trainees tested positive for COVID-19, Southwest failed to timely implement contact tracing and issue timely advisories about potential exposure for those in attendance at the training session. – steps needed to contain the virus and to alert other employees so that precautionary measures could be taken.

133.   Most telling, is that, on July 23rd, 2020, Ms. Madden  contacted her In-Flight
-Supervisor at the BWI based to explain that she might have been exposed to
COVID-19 and was experiencing symptoms, as was her husband.

134.   The In-flight Supervisor advised Ms. Madden that Southwest would not grant
her paid time off from her duties as a Flight Attendant until she was able to prove
she had COVID-19.

135.    On July 24th, 2020 Ms. Madden contacted her union (TWU 556), which had
established a COVID-19 Task Force.

136.   The Union official advised Ms. Madden that the Union had not been advised
of the problems being experienced by other attendees at the training session, which
by then Southwest knew existed.

137.   Requiring employees to prove they actually have COVID-19 before they are
granted leave was against CDC recommendations, and revealed the propensity of
Southwest to err on the side of incaution when it came to the health and well-being
of its employees.

138.   On July 27th, 2020, Andrew Dickey, from the Southwest Network Operating
Center, called Ms. Madden --  a full two weeks following the class -- to say that she
had been exposed *while in the Recurrent Training class on the 13th of July*; but that
her quarantine period was over.

139.   Upon information and belief, Southwest never made a timely effort to determine who else at the Recurrent Training session tested positive for COVID-19 when it was known that one or two employees had; at least not in time to permit evasive action.

140.   On information and belief, despite  knowing that an instructor at the required BWI training had contracted COVID-19, Southwest made no effort to alert or warn Ms. Madden or other attendees that an instructor had demonstrated symptoms of COVID-19 during that her Recurrent Training and undertook no effort whatsoever contact tracing for the instructor afflicted by COVID-19.

141.   Southwest's failure properly to screen attendees at the Recurrent Training event or to alert Ms. Madden after-the-fact were two fatal elements in the chain of causality that led to her husband's death: had Southwest properly screened employees prior to the event, they may have prevented any exposure, and their failure to  alerted Ms. Madden that there was a COVID-19-positive Flight Attendant Trainee or instructor at her session in a timely manner once they knew, prevented her from taking steps to isolate and  to avoid further transmission, particularly to  her husband.

***Events Unfolding the Following Week.--***

142.   By July 25, 2020 Ms. Madden's health began to improve; her fever and chills were gone although a severe headache and extreme fatigue lingered.

143.   However, at the same time Ms. Madden gradually improved, Mr. Madden's symptoms worsened.

144.   Mr. Madden was running a fever, experienced body aches, exhibited fatigue and showed a loss of appetite.

145.   But on Saturday, August 1, 2020, while Mr. Madden was still awaiting the results his COVID-19 test, his condition had declined dramatically.

146.   Because of growing concerns, Ms. Madden promptly drove her husband to the WellSpan Hospital in York, Pennsylvania.

147.   There, the hospital gave Mr. Madden a rapid-response COVID-19 test.

148.   The test quickly returned a positive result.

149.   When Mr. Madden's condition declined further, the hospital ordered a computerized axial tomography (CAT) scan.

150.   That scan revealed that Mr. Madden had contracted COVID pneumonia with "ground glass" in his lungs as a complication of COVID-19.

151.   Mr. Madden was promptly admitted to the COVID-19 wing of the hospital.

152.   Despite seeking access to her husband, Ms. Madden was given only limited access – consistent with protocol -- to assist, see, comfort or be with her husband.

153.   She was denied access from the date Mr. Madden was admitted until after his heart attack on August 7, 2020.

154.  At approximately 3 o'clock a.m. on August 2, 2020, Mr. Madden experienced atrial fibrillation.

155.  Following this, Mr. Madden was immediately moved to the Cardiac Intensive Care Unit, where he was given high flow oxygen and multiple IV's.

156.  During the initial stages of his stay in the Cardiac Intensive Care Unit, Mr. Madden was administered blood plasma and Remdesivir as therapeutics, as well as anti-clotting medication.

157.  But despite the anti-clotting treatment, Mr. Madden developed a COVID-19-induced blood clot in his heart.

158.  As a result, he suffered a severe heart attack.

159.  On August 6th, 2020, although he could not physically be accompanied by her, he told his wife he was scared and confused, and was suffering from great distress.

160.  Again, at this time, Ms. Madden was not allowed into the hospital to assist, see, comfort or be with her husband.

161.  Mr. Madden's health spiraled downward further.

162.  In the Cardiac Intensive Care Unit on that same day, attending physicians attempted a cardiac catherization procedure on Mr. Madden to remove the clot; however, they were unable to move the clot or even to reduce its size.

163.  Physicians attempted to insert a stent into Mr. Madden's vein, but that was unsuccessful.

164.   Through these attempts at treatment, Mr. Madden suffered increasing and severe damage to his heart.

165.   Mr. Madden suffered a STEMI (ST elevation myocardial infarction)

166.   Again, throughout the entire trauma, Ms. Madden was denied access into the hospital to assist, see, comfort or be with her husband, adding not only to his distress but Ms. Madden's distress.

167.   August 6th 2020 marked the beginning of the end.

168.   On that date, Mr. Madden was intubated.

169.   He began to suffer the onset of renal failure.

170.   His condition deteriorated further while he was in the cardiac ICU.

171.   Only on August 7, 2020, was  Ms. Madden allowed to be in the same room with her husband, although to this day does not know if he was then aware of her presence.

172.   On August 12, 2020, at 3:14 p.m. Mr. Madden's heart stopped.

173.   Hospital staff attempted to revive Mr. Madden.

174.   After 20 minutes, Mr. Madden's his heart stopped again.

175.   Mr. Madden was pronounced dead at 3:34 p.m.

***Causality of Negligence.--***

176.   Southwest knew what needed to be done to safeguard its employees during the training sessions, because it took these steps, and publicized the same, relative to its customers to assuage their concerns.

177.   Southwest knew what needed to be done to safeguard its employees during the training sessions, because such protocols were industry-standards.

178.   Southwest knew what needed to be done to safeguard its employees during the training sessions, because it was public knowledge, enunciated by government agencies and through various advisories.

179.   Southwest knowingly failed to take these same precautions for its employees, creating for them an unsafe working environment that would never have been tolerated for its customers.

180.   Southwest's failure to adhere to rudimentary safety protocols at the Recurrent Training session was the direct and proximate cause of Ms. Madden contraction of COVID-19.

181.   Southwest's failure to screen candidates, to test candidates before and during training, to sanitize equipment used, to enforce distancing protocols, and to exercise contact tracing or notification protocols – *i.e.,* in essence, to ensure a safe environment for its employees --   were not only substantial factors in the

transmission of the virus to Ms. Madden, but the causation-in-fact of her illness and her husband's death.

182.   In conducting the training session in the manner in which it did, Southwest effectively failed to furnish places of employment that were free from recognized hazards that were likely to cause death or serious physical harm to the Flight Attendant Trainees.

183.   Ms. Madden would not have contracted COVID-19 but for the failure of Southwest to adhere to these common safety protocols outlined above, and it was fully aware of these failures.

184.   Southwest was aware, or reasonably should have been aware, that if Ms. Madden contract COVID-19 at her workplace, there was a high likelihood that Mr. Madden would transmit that virus to her husband and others with whom she had close contact.

185.   But for the failure of Southwest to adhere to these common safety protocols of which it was fully aware, Mr. Madden would not have contracted COVID-19, and Southwest's failure to adhere to these standards of care was the direct and foreseeable cause of the transmission of the virus to Ms. Madden and Mr. Madden.

186.   What caused Mr. Madden to contract COVID-19 was his foreseeable companionship with his wife after her exposure to COVID-19 during the Recurrent Training session.

187.   Had Ms. Madden not attended and participated in the BWI training conducted by Southwest, Ms. Madden would not have contracted the illness, Mr. Madden would not have contracted the illness, and Mr. Madden would be alive today.

188.   The transmission of the virus to Mr. and Ms. Madden was a foreseeable consequence of Southwest's failure to exercise the proper standard of care due its employees at the training session it conducted.

189.   By requiring Ms. Madden to participate in training that did not properly exercise safe protocols, widely employed in the pandemic and by the defendant itself in other scenarios, Southwest exposed both Mr. and Ms. Madden to a general field of danger (transmission of the virus) that Southwest should have anticipated, expected and avoided.

**Damages.—**

190.   Ms. Madden eventually recovered from COVID-19; but to this day, and each day, relives the tragedy that befell her husband.

191.   As a result of Southwest's breach of its numerous duties to Ms. Madden and by extension Mr. Madden, Ms. Madden suffers mental anguish, pain and suffering, and loss of consortium and companionship from the death of her husband, with whom she shared 35-years of her life.

192.   Mr. and Ms. Madden were not just soulmates, and lifelong companions, they relied upon each other for income and for their retirement.

193.   They had planned to grow old together after many years of work, and but for the negligence of Southwest, would have done so.

194.   Ms. Madden suffered the loss of economic income and support as well.

195.   Mr. Madden's premature death resulted in an economic loss to Ms. Madden of Mr. Madden's pension of $36,297.00 per year, Mr. Madden's railroad retirement benefit income of $41,577.00 per year, and the loss of the railroad retirement benefit to Carol Madden based upon her husband's  service of $20,248.00 per year.

196.   She has incurred hospital charges in excess of $800,000.

197.   During the advent of his illness on July 17th, 2020 until the time of his death on August 2, 2020, Mr. Madden suffered greatly.

198.   Over this 16-day period, Mr. Madden was in physical and mental distress, borne out by his own statements to his wife.

199.   He died alone, in the presence of strangers, not even aware of whether or not his wife had fully recovered.

## IV. SPECIFIC COUNTS

**COUNT 1: NEGLIGENCE  (Against Southwest on Behalf of the Estate of William Madden under the Survival Statute (as Authorized by CJP §6-401))**

200.   Plaintiff, the Estate of William Madden, through Carol Madden, his Personal Representative, incorporates by reference each and every prior and subsequent allegation as if fully set forth herein.

201.    Southwest at all relevant times owed Ms. Madden and Mr. Madden the duty to exercise reasonable care to protect them from injury.

202.    As more fully set forth above, Southwest breached this duty of care to Decedent by its acts and omissions, notably by exposing Ms. Madden, with whom Southwest knew or should have known he would have close contact, to COVID-19.

203.    Southwest failed to take any reasonable measure to protect its employees against exposure to COVID-19 in Recurrent Training.

204.    Southwest acted carelessly when it (a) failed to screen Flight Attendant Trainees in the training session,  (b) failed to screen instructors in the training session, (c) failed to exclude those that had been exposed to COVID-19, (d) failed to enforce mask policies that would have lessened transmission, (d) failed to implement safe distancing requirements, (e) failed to sanitize equipment in shared and common use, and (f) failed to implement contact tracing that would have prevented transmission after-the-fact or alerted Flight Attendant Trainees at an early time to exposure.

205.    William Madden died as a direct and proximate result of Southwest's failure to protect his wife and thereby him from exposure to SARS-CoV-2 and from contracting COVID-19.

206.    Prior to his death Mr. Madden endured excruciating pain, discomfort and suffering from shortly after infection until the time of his death.

207.    In the days before his death, Mr. Madden suffered significant anguish, fear and distress.

208.    As evidenced by communications with his wife – communications that showed dismay and fear -- Decedent was well aware that he was struggling for his breath before perishing.

209.    For the negligent actions and omissions of Southwest, the Estate of William Madden is entitled to damages under Maryland's Survivor's statute for the pain, suffering and mental anguish he was forced to endure.

210.    Decedent's anguish, fear, distress was intensified by his failure to touch, meet with and see his wife.

**WHEREFORE,** the Estate of William Madden seeks judgment against Southwest in an amount that exceeds 3 MILLION DOLLARS ($3,000,000) for the damages he endured through their negligence.  Such damages include non-economic damages, for the pain, suffering and mental anguish he sustained between the time he first because ill, through his hospitalization until the time of his death. In addition to these non-economic damages, the Estate of William Madden, seeks funeral expenses paid (up to the limit stated in Md. Code, Est.&Trusts 8-106(c)), costs, and pre- and post-judgment interest as appropriate.

**COUNT 2.   Gross Negligence (Against Southwest on Behalf of the Estate of William Madden under the Survival Statute (as Authorized by CJP §6-401))**

211.   Plaintiff, the Estate of William Madden, through Carol Madden, his Personal Representative, incorporates by reference each and every prior and subsequent allegation as if fully set forth herein.

212.   At all times material, Southwest was fully aware of the potential for COVID-19 spread and infection among the trainers and Flight Attendant Trainees required to attend the Recurrent Training sessions.

213.   Southwest not only failed to exercise a standard of care to protect its employees against exposure to COVID-19 at the Recurrent Training session, but demonstrated reckless indifference to the health and welfare of its employees through its intentional failure to perform the duty of care owed to its them.

214.   At all times material here, Southwest was fully aware that its conduct would create a risk of harm to Flight Attendant Trainees.

215.   By failing to apply the same level of precautions and protocols for its Flight Attendant Trainees that it exhibited towards its fare-paying customers and for other reasons, Southwest demonstrated it had  knowledge of facts underlying the risk such that it should have appreciated the extent to which it was exposing its employees to that risk.

216.   In fact, Southwest's negligent acts and omissions, exposed its Flight Attendant Trainees to a risk of harm that was extreme and outrageous, and which

failed both (a) to consider the high probability of risk of viral transmission, and (b) the severity of the harm that would result from exposure to COVID-19.

**WHEREFORE,** the Estate of William Madden seeks judgment against Southwest in an amount that exceeds 3 MILLION DOLLARS ($3,000,000) for the damages he endured through their negligence. Such damages include non-economic damages, for the pain, suffering and mental anguish her sustained between the time he first because ill, through his hospitalization until the time of his death. In addition to these non-economic damages, the Estate of William Madden, seeks funeral expenses paid (up to the limit stated in Md. Code, Est.&Trusts 8-106(c)), costs, and pre- and post-judgment interest as appropriate.

## COUNT 3.   Negligence (Against Southwest on Behalf of Carol Madden under the Wrongful Death Statute (as Authorized by CJP §3-904))

217.   Plaintiff, the Estate of William Madden, through Carol Madden, his Personal Representative, incorporates by reference each and every prior and subsequent allegation as if fully set forth herein.

218.   Carol Madden is the sole survivor of her husband, William Madden.

219.   At all times relevant hereto Southwest owed Ms. Madden and Decedent the duty to exercise reasonable care to protect them from injury.

220.   Southwest breached this duty of care by the acts and omissions alleged above.

221.   Mr. Madden died as a direct and proximate result of Southwest's failure to protect Ms. Madden and him from exposure to COVID-19.

222.   Because of Southwest's negligence, which led to Ms. Madden's exposure to COVID-19, Ms. Madden, who relied on the Decedent's pension in part, has suffered foreseeable, continuing, preventable, and substantial pecuniary harm.

223.   Ms. Madden has suffered the loss of the financial contributions that Decedent would have contributed to the family unit; including, those contributions that would have been made to their mutual consumption, to their retirement, to their expenses.

224.   Through Decedent's death, Ms. Madden has suffered the loss of fringe benefits attributable to Decedent, Railroad Retirement coverage, PATH pension coverage, and federal tax exemption.

225.   Ms. Madden has suffered the loss of household services that would have been performed by the Decedent, such as Decedent's contributions to maintenance and various household chores.

226.   And apart from these substantial pecuniary losses, the pain and anguish faced by Decedent as he suffered and died, has been visited upon Ms. Madden, in the form of recoverable non-economic damages.

227.   With the death of her husband, Ms. Madden is being denied his companionship for the reminder of her life.

228.   The non-economic damages suffered by Ms. Madden through the Wrongful Death of her husband of 35 years, include damages for mental anguish, emotional

pain and suffering, loss of society, companionship, comfort, protection, care (marital care, parental care), attention, advice and counsel..

229.    And these non-economic damages are exacerbated by the manner of the loss.

WHEREFORE, Ms. Madden seeks judgment against Southwest in an amount that exceeds 3 MILLION DOLLARS ($3,000,000) for Southwest's negligence in causing the Wrongful Death of her husband.  Such damages include economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

## COUNT 4: GROSS NEGLIGENCE   (Against Southwest on Behalf of Ms. Madden for the Wrongful Death of Decedent (as Authorized by CJP §3-904)

230.   Plaintiff, the Estate of William Madden, through Carol Madden, his Personal Representative, incorporates by reference each and every prior and subsequent allegation as if fully set forth herein.

231.    As more fully set forth therein, Southwest's acts, errors and omissions constitute *gross* negligence.

232.    Through its actions and omissions, Southwest exercised willful and wanton misconduct, which demonstrated reckless disregard for the life of Decedent.

233.    The wanton, reckless and thoughtless disregard for the safety and wellbeing of Decedent is evidenced by the fact that, although Southwest knew how to protect is passengers, Southwest provided virtually none of the same protection to its employees.

234.   That Southwest knew harm could befall its Flight Attendant Trainees is indicated, *inter alia*, by the fact that they failed to take the same precautions for their employees that they knew were advisable for their customers.

235.   Southwest's wanton, reckless and thoughtless disregard for the safety and wellbeing of Ms. Madden and her husband is demonstrated by their failure to (a) screen Flight Attendant Trainees in the training session,  (b)  screen instructors in the training session, (c) exclude those Flight Attendant Trainees and Instructors that had been exposed to COVID-19, (d) enforce mask policies that would have lessened transmission, (e) implement safe distancing requirements, (f) sanitize equipment after use, or (g) implement contact tracing that would have prevented transmission after-the-fact.

236.   The injury Southwest inflicted upon Decedent and his wife was done with utter indifference to the rights of Decedent and to the consequence of its action.

**WHEREFORE,** Ms. Madden seeks judgment against Southwest in an amount that exceeds  3 MILLION DOLLARS ($3,000,000) for Southwest's Gross Negligence which caused the Wrongful Death of her husband, as the case may be. Such damages include of economic and non-economic damages, punitive damages, plus costs, pre- and post-judgment interest as each may be entitled.

## V.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, in her representational and individual capacity, Prays for judgment against Defendant in an amount that exceeds 3 MILLION DOLLARS ($3,000,000).

In particular, as more fully set forth in Counts I and II, and as authorized by Maryland's Survivor statute, the Estate of William Madden Prays for non-economic damages caused by the pain, suffering and anguish experienced by Decedent.

As more fully set forth in Counts III and IV, as authorized by common law and Maryland's Wrongful Death statute, Plaintiff Carol Madden Prays for pecuniary damages to which she is entitled.  Specifically, Ms. Madden Prays for damages representing the loss of income, savings and the value of services provided by Decedent and non-economic damages to which she is entitled.

Plaintiff also Prays for punitive damages, pre- and post-judgment interest as allowed by law, the costs of this suit and such other and further relief as this Honorable Court may deem just and proper.

## VI.  DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all claims hereunder that may be triable before a jury.

Respectfully submitted,

/S/ *Dan R. Mastromarco*

_____

DAN R. MASTROMARCO
Fed. MD Bar ID 18243
MD CPF ID: 0901140002
THE MASTROMARCO FIRM, LLP
703 Giddings Avenue, U5
Annapolis, MD 21401
danmastromarco@gmail.com
410.349.1725 O
202.285.9097 C
410.268.1597 Fax