# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ESTATE OF WILLIAM MADDEN, *et al.*, | * |
| Plaintiffs, | * |
| v. | * Civil Action No.: 1:21-cv-00672-SAG |
| SOUTHWEST AIRLINES, CO., | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Carol Madden ("Ms. Madden"), on behalf of herself and the Estate of her deceased husband William Madden ("Mr. Madden") (collectively, "Plaintiffs"), sued Southwest Airlines Co. ("Southwest") asserting four negligence-based causes of action related to Mr. Madden's contraction of and subsequent death from COVID-19. ECF 1, ¶¶ 200-36. Southwest moved to dismiss. ECF 6. Plaintiffs opposed the motion, ECF 11, and Southwest replied, ECF 12. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons set forth below, Southwest's Motion to Dismiss will be granted and Plaintiffs' claims will be dismissed without prejudice.

## I.     FACTUAL BACKGROUND

The following facts are drawn from Plaintiffs' Complaint and are taken as true for the purposes of this Motion to Dismiss. Ms. Madden is a flight attendant employed by Southwest. ECF 1 ¶8. The Federal Aviation Administration ("FAA") requires active flight attendants to attend Recurrent Training and to maintain a Certificate of Demonstrated Proficiency ("Certificate"). *Id.* ¶¶ 24-26. Southwest was therefore required to direct Ms. Madden to attend Recurrent Training to maintain her Certificate if she wished to continue her employment. *Id.* ¶ 28. Ms. Madden attended

1

Recurrent Training on July 13, 2020, at the Baltimore Washington International Airport. *Id.* ¶ 31. The training involved groups of ten participant flight attendants at a time, including Ms. Madden, demonstrating various proficiencies such as the ability to use various safety devices onboard an aircraft. *Id.* ¶ 34.

During this training, Southwest allegedly failed to implement reasonable safety and health protocols to prevent the participant flight attendants from contracting or spreading COVID-19. Plaintiffs identify various alleged failings including: (a) failing to screen participant flight attendants in the training session for COVD-19, (b) failing to screen instructors in the training session for COVID-19, (c) failing to exclude those that had been exposed to COVID-19, (d) failing to enforce mask policies that would have lessened transmission, (d) failing to implement safe distancing requirements, (e) failing to sanitize equipment in shared and common use, and (f) failing to implement contact tracing that would have prevented transmission after-the-fact or alerted participant flight attendants at an early time to COVID-19 exposure. *Id.* ¶ 204.

As a result of Southwest's failure to exercise a standard of care to prevent transmission of the virus, Ms. Madden was exposed to COVID-19 during the training. *Id.* ¶¶ 98-99. Two weeks following the training, a Southwest employee called Ms. Madden to inform her of the exposure at the training, but at that point both Ms. Madden and Mr. Madden had developed symptoms. *Id.* ¶ 138, 186. Indeed, approximately three days after the training concluded, Ms. Madden began experiencing increasingly more severe COVID-19 symptoms. *Id.* ¶ 101. Ms. Madden was in close contact with her husband, with whom she lived, ultimately transmitting COVID-19 to him. *Id.* ¶ 186. Mr. Madden began experiencing symptoms approximately ten days after the training, before testing positive for COVID-19 on August 1, 2020. *Id.* ¶¶ 107, 145-48. Mr. Madden's condition

rapidly deteriorated, and he ultimately passed away on August 12, 2020 due to complications from the COVID-19 virus. *Id.* at ¶¶ 142-75.

## II. LEGAL STANDARD

Southwest has filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'"); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam).

3

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d 435 at 440 (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, a court is not required to accept legal conclusions drawn from the facts. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

## III.  ANALYSIS

To state a claim for negligence in Maryland, a complaint must plausibly allege the following four elements: (1) that the defendant owed a duty to the person who was injured; (2) that the defendant breached that duty; (3) that an actual injury or loss existed; and (4) that the injury or

4

loss proximately resulted from the defendant's breach of the duty. *See, e.g.*, *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 76 (Md. 1994). The same elements apply to gross negligence, though the showing requires more egregious conduct on the part of the defendant. *See Taylor v. Harford County Dep't of Social Servs.*, 384 Md. 213, 227-28 (Md. 2004). The parties disagree, here, as to the first, threshold factor—whether Southwest owed a duty to Mr. Madden, given that he was not a Southwest employee and otherwise had no relationship with the company beyond his wife's employment. "[T]he existence of a legal duty is a question of law to be decided by the court." *Remsburg v. Montgomery*, 376 Md. 568, 581 (2003). For the following reasons, the Court concludes that no duty existed, such that Plaintiffs have failed to state any negligence-based claims.

### a. The Appropriate Framework for Assessing Duty

The parties dispute the proper framework for assessing the existence of a duty in Maryland. Southwest argues that this case is covered by a bright line rule, namely Maryland's alleged refusal to recognize any duty on the part of an employer to an employee's spouse in the context of "take-home" exposure to diseases and dangerous substances absent one of three exceptions not present here: a special relationship, control, or a relevant statute. *See* ECF 6-17 at 7-8. Analyzing asbestos, HIV, and other similar cases in which an employer's alleged negligence resulted in an employee bringing a harm home from work which injured the employee's spouse, Southwest asserts that these cases' uniform finding of "no duty" are directly applicable and end the duty inquiry without further analysis. *Id.* at 7-12.

Plaintiffs, on the other hand, suggest that Southwest's case law is distinguishable by virtue of those cases' focus on nonfeasance (as opposed to the malfeasance allegedly at issue here).

5

Instead, Plaintiffs urge the assessment of seven factors some Maryland courts have used to identify the existence of a duty. ECF 11 at 16-17.

In fact, Maryland's duty analysis appears to lie somewhere in between the two parties' positions. In *Sumo v. Garda World*, 2017 WL 2962819, at *3 (Md. Ct. Spec. App. July 12, 2017), the Maryland Court of Special Appeals faced a similar choice between the two frameworks. In the context of a third-party duty claim involving a bystander injured during a violent robbery, the *Sumo* defendant claimed that the lack of a special relationship ended the third-party duty inquiry, while plaintiff sought application of the seven factors. *Id.* The *Sumo* Court ultimately found that "the exact relationship between the three exceptions to the 'no duty' rule [for third-party harms] . . . and this 7-factor test, is unclear" but went on to conclude that the two approaches were "consonant" with one another, ultimately analyzing duty under *both* frameworks. *Id.* (citing *Kiriakos v. Phillips*, 448 Md. 440, 486 (2016)).

The Court, here, is similarly unable to divine a clear rule demarcating the application of one duty analysis versus the other. Southwest's reliance on cases like *Warr v. JMGM Grp., LLC*, 433 Md. 170, 189-90 (2013), is persuasive in that the cases contain broad and seemingly unambiguous language embracing a "no duty" rule absent a relationship between the defendant and the injured third party. Indeed, *Warr* itself is particularly compelling in that it appears to reject an argument nearly identical to Plaintiffs' theory here, namely that a defendant's active creation or aggravation of a risk creates a different, broader set of duties than where a defendant fails to act to prevent or mitigate an unrelated risk. *Id.* at 185-190; *see also Barclay v. Briscoe*, 427 Md. 270, 300-01 (2012) (rejecting the existence of a duty where employer's conduct allegedly created foreseeable risk of harm to a third party). However, it is also true that Maryland courts have consistently used the seven-factor analysis proposed by Plaintiffs to assess whether a duty exists,

instead of simply relying on Southwest's proffered bright line rule. *See, e.g.*, *Eisel v. Bd. of Educ. of Montgomery County*, 324 Md. 376, 386 (Md. 1991); *May v. Air & Liquid Sys. Corp.*, 446 Md. 1, 11 (Md. 2015). In fact, even *Warr* invoked the seven factors, despite its language strongly suggesting the existence of a blanket "no duty" rule absent control or a special relationship. 433 Md. at 182-83. As such, the Court will follow the *Sumo* Court's lead and will assess whether Southwest owed a duty under both the seven-factor and the "no third-party duty" approaches.

### b. No Third-Party Duty Approach

As noted above, Maryland's general rule is that "a private person is under no special duty to protect another from the criminal [or tortious] acts by a third person." *Valentine v. On Target, Inc.*, 353 Md. 544, 550 (1999) (citation omitted). After all, "[o]ne cannot be expected to owe a duty to the world at large to protect it against the actions of third parties . . . ." *Id.* at 553. There are three exceptions, however, to this "no duty" rule:

(1) If the defendant has control over the conduct of the third party;

(2) If there is a special relationship between the defendant and the third party or between the defendant and the plaintiff; or

(3) If there is a statute or ordinance that is designed to protect a specific class of people.

*Warr*, 433 Md. at 189 (control); *Barclay*, 427 Md. at 293-94 (special relationship); *Kiriakos*, 448 Md. at 457 (statute or ordinance).

None of these three enumerated exceptions apply in this case. Plaintiffs do not argue that Southwest had control over Ms. Madden after she left the flight attendant training, nor do they argue that it had a special relationship with Mr. or Ms. Madden,[1] or that a statute governed its

---

[1] The employment relationship here between Southwest and Ms. Madden is not a "special relationship" that would give rise to a duty to Mr. Madden, because Ms. Madden was operating outside the scope of her employment when she returned home post-training and had close contact

7

conduct in this area protecting third parties like Mr. Madden.  Instead, Plaintiffs rely on a theory centering on "malfeasance"—the notion that Southwest owed Mr. Madden a duty because its affirmative conduct in conducting its flight attendant training without adequate safety protocols created a previously non-existent risk of harm to him by negligently exposing his spouse to COVID-19.  Such a notion is, obviously, not covered by the exceptions to the standard "no duty" rule outlined above, meaning that under the standard approach, Southwest owed Mr. Madden no duty.

      **c. Seven-Factor Test**

The Court next assesses this case under Plaintiffs' preferred seven-factor test for duty, which consists of the following:

    (1) the foreseeability of harm to the plaintiff,

    (2) the degree of certainty that the plaintiff suffered the injury,

    (3) the closeness of the connection between the defendant's conduct and the injury,

    (4) the moral blame attached to the defendant's conduct,

    (5) the policy of preventing future harm,

    (6) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise reasonable care with resulting liability for breach,

    (7) and the availability, cost and prevalence of insurance for the risk involved.

*Kiriakos*, 448 Md. at 486 (quoting *Ashburn v. Anne Arundel Cnty.*, 306 Md. 617, 627 (1986)).  The Court will address each factor in turn.

---

with Mr. Madden.  *See Barclay*, 427 Md. at 295.  Furthermore, while the Restatement (Second) of Torts § 317 makes clear that a special relationship may exist even when an employee is operating outside the scope of employment so long as certain requirements are met, several of § 317's factors are not satisfied here.

### i. Foreseeability of the Harm

Drawing on the case law cited in *Sumo*, "[f]oreseeability as a factor in the determination of the existence of a duty involves a prospective consideration of the facts existing at the time of the negligent conduct." *Henley v. Prince George's Cnty.*, 305 Md. 320, 336 (1986). In the context of duty, the "foreseeability of harm test . . . is based upon the recognition that a duty must be limited to avoid liability for unreasonably remote consequences." *Valentine*, 353 Md. at 551. "Although foreseeability is perhaps most important among these factors, it alone does not justify the imposition of a duty." *Kiriakos*, 448 Md. at 486 (citation omitted). Here, the question is whether it was foreseeable to Southwest, and not unreasonably remote, that as a result of its allegedly unsafe flight attendant training in the midst of a global pandemic, one training attendee would contract COVID-19 and fatally infect her spouse with it.

Based on the facts as presently alleged, such an outcome is both foreseeable and not unreasonably remote. The COVID-19 virus is extraordinarily contagious and spreads via close contact, particularly in the absence of sufficient cleaning and social-distancing techniques designed to limit the possibility of spread. Southwest was unavoidably aware of the nature of the virus, as demonstrated by its website's apparent assurances that it was implementing "stringent cleaning and physical-distancing practices" and "[knew] what needs to be done and how it needs to be done to keep people safe," among other commitments to COVID-19 safety. ECF 1 ¶¶ 81-86. Failing to actually implement such transmission-mitigation strategies at an in-person flight attendant training would foreseeably increase the risk of flight attendant(s) contracting the virus. It was, similarly, foreseeable that an infected flight attendant like Ms. Madden would subsequently be in close proximity to her spouse, because married couples frequently live together and share close contact, particularly when quarantining at home was recommended by health authorities.

And it is, tragically, foreseeable that a family member who contracts COVID-19 may die, given the severity of the virus. While such developments may occur over an extended period of time because of incubation periods post-transmission and varying degrees of immune responses to the virus, the causal chain leading to Mr. Madden's death was neither remote nor unforeseeable.

### ii. Degree of Certainty of Injury

This second factor is, functionally, a causal inquiry—how certain is it that Southwest's actions would cause Plaintiffs' injuries? *See Sumo*, 2017 WL 2962819, at *5. Plaintiffs, of course, need not definitively *prove* causation at this juncture, since assessment of whether causation exists on these specific facts is generally a jury question in negligence cases. However, the defendant's conduct must be reasonably certain to lead to the plaintiffs' injuries in the abstract (i.e. is conducting a training without adequate safety protocols reasonably certain to be the cause of an attendee's COVID-19 infection and subsequent transmission to a spouse?). This is a much closer call than the foreseeability factor. Holding an unsafe training would certainly increase the risk of COVID-19 exposure. However, as previously noted, COVID-19 is incredibly infectious and transmits easily in a variety of settings. *See Coronavirus (COVID-19) Frequently Asked Questions*, Centers for Disease Control and Prevention ("CDC") (June 22, 2021), https://www.cdc.gov/coronavirus/2019-ncov/faq.html. By Plaintiffs' own admission, this makes identifying the precise origin of one's illness extremely difficult. *See* ECF 11 at 34-35 (acknowledging the general challenges of proving causality regarding COVID-19 infections given the prevalence of the virus).

Although a close COVID-positive contact is certainly a possible cause of a given infection, that is little guarantee that the particular infection originated from that contact as opposed to some other source, given how hard it is to completely isolate oneself from other, ubiquitous infection

vectors. This rationale holds even greater strength when applied to a third party like Mr. Madden who did not attend the training and thus is insulated by another layer of causal uncertainty. In the midst of a global pandemic, it is incredibly challenging to know precisely where or when any individual caught the virus—indeed, that is precisely what has made the pandemic such a difficult beast to contain. Thus, there is a substantial degree of *un*certainty that the Southwest's training would be reasonably certain to cause any third-party non-attendee to contract COVID-19, such that this factor weighs against imposition of a duty.

### iii. Closeness Between Southwest's Conduct and Injury

"The third factor . . . is, by another name, proximate cause." *Sumo*, 2017 WL 2962819, at *5. The analysis requires a balancing of the connection between the breach of duty and the harm, as well as the nature of the risk—as the magnitude of the risk increases, the closeness of the connection is relaxed such that a duty to a larger class of persons may be imposed where the risk is of death or personal injury. *Kiriakos*, 448 Md. at 488. Here, the nature of the risk is high given the severity of the COVID-19 virus (particularly during the pre-vaccine time period when the events of this lawsuit took place). Thus, the "closeness" between conduct and injury—which, as outlined in the previous section, is lacking insofar as reasonable certainty of causation is concerned—may be relaxed to encompass a more remote connection. Mr. Madden did not attend Southwest's allegedly unsafe training and had no direct contact with Southwest. However, as noted in Section III(b)(i), the chain of events leading from the training to Ms. Madden's infection at that training to her close contact with Mr. Madden to his subsequent infection and death is foreseeable. Ultimately, the likelihood that a flight attendant would contract COVID-19 at an unsafe, in-person training during a pandemic, and then transmit it to her co-habitant spouse, is "not

11

so remote that we simply foreclose liability," *Sumo*, 2017 WL 2962819, at *5 (citations omitted). Therefore, this factor also weighs in Plaintiffs' favor.

### iv. Moral Blameworthiness of Southwest's Conduct

"Under [the moral blame] factor, our standard is not evidence of intent to cause harm . . . [r]ather, we consider the reaction of persons in general to the circumstances." *Kiriakos*, 448 Md. at 489 (citations omitted). Taking Plaintiffs' allegations as true, Southwest's conduct is morally blameworthy. The reasonable reaction to a global pandemic would be to take all necessary precautions when holding in-person gatherings, particularly in the context of a flight attendant training requiring close proximity of the trainees to one another and the shared handling of equipment required by the various training exercises. In fact, Southwest outlined at length the COVID-19 safety protocols it claimed to be implementing as an assurance to its customers that it was committed to their safety while flying. To allegedly disregard these protocols and hold an in-person training without adequate safety precautions, in the midst of a global pandemic taking hundreds of thousands of lives across the United States, is morally blameworthy. This factor therefore weighs in favor of imposing a duty.

### v. The Policy of Preventing Future Harm

The fifth factor considers whether imposition of a duty would help prevent future harm by providing "a strong incentive to prevent the occurrence of the harm." *Kiriakos*, 448 Md. at 490. Finding a duty here would incentivize employers to take minimum precautions against the spread of COVID-19 to employees and their families via the implementation of minimum safety procedures that most companies, including Southwest, already ostensibly embrace. ECF 1 at ¶¶ 80-97. It would appear uncontroversial to suggest that stopping the spread of COVID-19 is an important policy goal, and the existence of a duty would unmistakably further that goal by

12

preventing first order infections of employees and therefore protecting against later spread to third parties. This factor therefore also weighs in favor of a duty.

### vi. Burden on Southwest and Consequences of Imposing a Duty

At least insofar as Southwest specifically is concerned, there appears little "additional" burden that imposition of a duty here would create. Employers like Southwest would be required to take reasonable steps to ensure the safety of foreseeable third parties like Mr. Madden from contracting COVID-19 as a result of Southwest's activities. To do so, employers would simply be required to follow best practices like social distancing, contact tracing, and regular sanitation protocols to protect their own employees, so that those employees do not become conduits to their cohabitants. Southwest already embraced such practices with regard to its customers, *id.* at ¶¶ 80-97—in fact, one might reasonably expect that ensuring flight attendants' safety would be a natural corollary of Southwest's promise to protect its customers.

The broader societal consequences of the imposition of that duty, however, are harder to justify. Such a duty would significantly expand the field of potential liability. *See Sumo*, 2017 WL 2962819, at *6 (considering an "overly expanded field of potential liability" as a reason to weigh the sixth factor against imposition of a duty). As Southwest points out, Maryland courts have historically been exceedingly concerned about "opening the floodgates" to expansive new classes of third-party plaintiffs. Maryland courts have furthermore expressed this concern specifically in the context of possible duties owed by an employer to an employee's spouse. *See, e.g.*, *Doe v. Pharmacia & Upjohn Co.*, 388 Md. 407 (2005) (holding that an employer does not owe a duty to third-party spouse of employee when employee contracted HIV at work and transmitted it to his wife); *Adams v. Owens-Illinois, Inc.*, 119 Md. App. 395 (1998) (finding employer had no duty to employee's wife with regard to asbestosis allegedly contracted from close

contact with employee's clothing). Plaintiffs suggest that there are special circumstances here that give rise to a duty here. For example, they cite the fact that Ms. Madden lived alone with her husband, was following CDC guidelines by staying at home with him, and was directly exposed to COVID-19 at Southwest's training, such that the causal link to Mr. Madden's ultimate infection is uniquely clear. ECF 11 at 33-34. However, as Plaintiffs acknowledge, COVID-19 is "ubiquitous," *id.*, and as previously noted, an individual's exact point of exposure is therefore often exceedingly difficult to trace, even in circumstances where precautions are taken or where one point of exposure is known. Thus, despite Plaintiffs' contentions, there are no special causation-based limitations that would allow successful litigation here but foreclose it elsewhere—instead, finding a duty here would leave employers litigating countless COVID-19 third-party exposures simply by virtue of contact with their employees during the pandemic. All that would functionally be required for duty to attach would be potential exposure at work and subsequent contact with a foreseeable third party, which represents a relatively common set of circumstances.

Similarly, the class of foreseeable third-party plaintiffs suggested by Plaintiffs offers few clear limiting principles. Despite Plaintiffs' contention that Ms. Madden "practiced safe precautions," *id.*, foreseeability is not adequately narrowed by CDC or other similar guidelines recommending safety measures such as isolating at home and maintaining close contact only with co-habitants. First, it is eminently foreseeable that some individuals will not follow such safety guidelines and will instead have close contact with members of the public outside their homes. Plaintiffs proffer no reason why compliance with the CDC's recommended safety protocols is any more foreseeable than non-compliance, in terms of limiting the category of prospective third-party plaintiffs. Moreover, even if such guidelines are followed, the range of people one might come in close contact with "at home" can vary significantly, despite how facially narrow the notion of

"home" appears. It is not always as simple as Ms. Madden coming home to her husband alone. Take, for example, an apartment building—it may be necessary for a resident to walk through a common lobby, share an elevator, and pass other residents in narrow hallways. What distinguishes those encounters, unavoidable despite compliance with CDC guidelines, from Mr. Madden? Would Southwest be liable to everyone in Ms. Madden's hypothetical apartment building? What about essential outings like trips to the grocery store or, similarly, a bathroom break during Mr. and Ms. Madden's drive from BWI to Pennsylvania following the training? Any suggested limitation on the class of foreseeable third-party plaintiffs achieved by drawing the line at adherence to regulatory guidance and following safety protocols is of little practical use, given the many circumstances in which contact both falls within the guidelines and implicates an exceedingly broad cross-section of the public at large. The "floodgates" consequence of imposing a duty here therefore weighs against such an imposition.

### vii. Insurance for the Risk

The parties spend little time on this factor, but the Court agrees with Southwest that "COVID-19 claims are new for insurance companies and whether insurance coverage applies to COVID-19-related claims will be dependent on the specific facts, policy language, and applicable law in each case." ECF 12 at 10. Given these individualized considerations, the Court is unable to draw any broad conclusions one way or the other regarding how the imposition of a duty would impact insurance. *See Sumo*, 2017 WL 2962819, at *6 (declining to address the insurance factor where there was a lack of evidence in the record about insurance).

### viii. Balancing the Seven Factors

Taking stock of the foregoing factors, four of the seven weigh in favor of finding a duty, while two weigh against it (and the last, insurance, was not considered at all). This case, then,

does not provide the sort of clear-cut outcome that *Sumo* reached, leaving the Court to balance the factors against one another. The majority of the factors, including the factor ostensibly considered by Maryland courts to be the most important, foreseeability, *see Kiriakos*, 448 Md. at 486, weighed in favor of duty. Practically, however, foreseeability appears to frequently take a back seat to concerns regarding the consequences of finding a duty, at least where that duty would be owed to third parties. Such concerns over "opening the floodgates" to overly broad new categories of third-party plaintiffs are particularly evident in the Maryland cases covering spousal relationships. For example, in *Doe*, 388 Md. at 417, the HIV transmission case, the court found it foreseeable that an unwitting, infected employee would have sexual relations with his wife, just as it is foreseeable here that a COVID-infected employee would be in close contact with her husband. But that, alone, was not enough to overcome the court's concerns over where to draw the line between foreseeable sexual partners and others. *Id.* at 421. In fact, this case implicates a line that is far blurrier, because it involves mere close contact rather than sex, and thus generally implicates a broader class of potential third-party plaintiffs. Indeed, the "close contact" facet of this case shares close similarities with *Adams*, the asbestos transmission case, in which the Maryland Court of Special Appeals held that an employer had no duty to its employees' spouses, in part because of concerns over dramatically expanding the pool of potential plaintiffs without a clear way to distinguish third parties.[2] *See Adams*, 119 Md. App. At 411 ("If liability for exposure to asbestos could be premised

---

[2] It is significant, too, that the Maryland Court of Appeals more or less directly rejected Plaintiffs' proposed interpretation of the third-party duty doctrine in *Warr*, 433 Md. 170. Just as Plaintiffs do here, the dissent in *Warr* explored the relationship between the Second and Third Restatements of Torts, examined Prosser and other torts treatises, charted the evolution of Maryland case law, and ultimately suggested a dispositive distinction between an active creation of a risk of harm and passive failure to aid or rescue another when it comes to the existence of duty to a third party. *Id.* at 200-53. The *Warr* majority rejected this theory outright, flatly calling it an "attempt to sidestep our jurisprudence." *Id.* at 85. Regardless of the merits of Plaintiffs' understanding of the active-passive duty distinction, it would be a striking and inappropriate departure from Maryland

16

on Mary Wild's handling of her husband's clothing, presumably Bethlehem would owe a duty to others who came in close contact with Edwin Wild, including other family members, automobile passengers, and co-workers.").

Cumulatively, Maryland's third-party duty case law and its emphasis on limiting the class of prospective future plaintiffs heavily informs the Court's balancing. In fact, it is the dispositive weight on the scale in favor of finding "no duty" here, despite the fact that the narrow majority of factors, including foreseeability, favor imposition of a duty. Maryland courts have made their priorities with regard to third-party duties clear, and the prospect of an unstemmed and ill-defined tide of third-party plaintiffs bringing suit predominates the duty analysis.[3] Thus, Plaintiffs' proposed seven-factor balancing test and Southwest's proffered bright line "no third-party duty" rule are, as in *Sumo* and *Kiriakos*, "consonant" with one another—Southwest owed no duty to Mr. Madden.

---

jurisprudence to embrace that theory despite its explicit and direct rejection in *Warr* by Maryland's highest court.

[3] Plaintiffs argue that the "real harm" is not the prospect of a flood of COVID-19 litigation, but rather "the perverse effect [finding no duty] would have in emboldening the Defendant and others to skirt health safeguards . . ., allowing Southwest to treat their flight attendants with far less care than they express for the fare-paying [customer], eventually harming the public." ECF 11 at 38. This argument fails for two reasons. First, the crux of this dispute is not about how Southwest treats its flight attendants—the duty a company owes to an employee like Ms. Madden is distinct from the duty (if any) it owes to a third-party member of the public like Mr. Madden. To suggest that finding no duty here as to Mr. Madden somehow permits Southwest to negligently expose its employees to COVID-19 is to inappropriately conflate entirely separate questions of duty. Second, this Court, sitting in diversity, is tasked with the narrow responsibility of applying Maryland negligence jurisprudence, not simply deciding for itself which policy goals are most important. Maryland courts have expressed clear and consistent concern over opening the door to overly broad classes of plaintiffs in the context of duties to third parties. Thus, regardless of whether this Court agrees with Plaintiffs that the "floodgates" rationale should take a backseat to other concerns, it is not empowered to ignore Maryland courts' judgments on the matter.

### d. Dismissal without Prejudice

Southwest urges the Court to dismiss Plaintiffs' claims with prejudice, claiming that it is impossible for any set of pleadings to plausibly allege a duty owed by Southwest to Mr. Madden. ECF 6-1 at 12. "The determination whether to dismiss with or without prejudice under Rule 12(b)(6) is within the discretion of the district court." *Weigel v. Maryland*, 950 F. Supp. 2d 811, 825 (D. Md. 2013) (quoting *180s, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 638-39 (D. Md. 2009)). A plaintiff "should generally be given a chance to amend his complaint . . . before the action is dismissed with prejudice," though there are exceptions where there exists no set of facts the plaintiff could present to support the claim. *Id.* at 825-26. The Court declines to deviate from the "without prejudice" norm here. While it does appear unlikely that Plaintiffs will be able to plead additional facts to satisfy Maryland's third-party duty jurisprudence, it is not impossible that some new set of allegations could more closely link Southwest and Mr. Madden or otherwise alter the duty analysis. As such, Plaintiffs' claims will be dismissed without prejudice.

## IV. CONCLUSION

For the reasons set forth above, Southwest's Motion to Dismiss, ECF 6, is GRANTED and Plaintiffs' claims are dismissed without prejudice. This case will be closed. A separate Order follows.


Dated: June 23, 2021                       /s/

                                                   Stephanie A. Gallagher
                                                   United States District Judge